## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **KYLE CHAPMAN MOTOR SALES, LP,** | § | **LEAD CASE NO. 24-10143-SMR** |
| | § | |
| **KCMS PREMIER CREDIT, INC.,** | § | **SECOND CASE NO. 24-10144-SMR** |
| | § | |
| **CAVALIER LAMAR HOLDINGS, LP,** | § | **THIRD CASE NO. 24-10146-SMR** |
| | § | |
| Debtors. | § | **CHAPTER 11** |
| | § | **Jointly Administered Under** |
| | § | **Case No. 24-10143-SMR** |

## FROST BANK'S OBJECTIONS TO DEBTORS'
## JOINT PLAN OF REORGANIZATION AND RENEWED MOTION TO CONVERT OR,
## IN THE ALTERNATIVE, MOTION TO DISMISS

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**

**IF NO TIMELY RESPONSE IS FILED WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**

**A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

TO THE HONORABLE COURT:

Frost Bank ("**Bank**"), a secured creditor and party-in-interest in the above-styled cases, hereby files these Objections to Kyle Chapman Motor Sales, LP ("**Chapman Motor**"), KCMS Premier Credit, Inc. ("**Premier**"), and Cavalier Lamar Holdings, LP ("**Cavalier**")'s Joint Plan of Reorganization ("**Joint Plan**") and its Renewed Motion to Convert or, in the Alternative, Motion to Dismiss and in support shows:

### I.    SUMMARY OF RELIEF REQUESTED

1.     After allowing these Chapter 11 cases to languish for nearly a year without

proposing a plan of reorganization, Debtors filed a Joint Plan that is woefully inadequate. *See* ECF No. 128. For the reasons discussed below, the Court should sustain the Bank's objections to the Joint Plan because it does not meet § 1129(a)(3), § 1129(a)(8), or § 1129(a)(11), and further is not "fair and equitable" under 11 U.S.C. § 1129(b) and does not meet § 1129(b)(1) or § 1129(b)(2)(A)(iii).

2.      These jointly administered cases involving a car dealership with two locations— one in Austin, Texas and one in Buda, Texas—were filed almost immediately after the loans made by the Bank to Debtors matured (after multiple extensions and forbearance periods over the course of years). When the Bank refused to extend the forbearance period any further, Debtors immediately filed for bankruptcy to prevent the Bank from proceeding with collection remedies.

3.      After the Bank moved to convert this Chapter 11 case to a Chapter 7 case for the Debtors' failure to, among other things, comply with the agreed upon adequate protection payments, comply with their responsibilities as debtors-in-possession, as ordered by the Court, and file a timely, adequate plan of reorganization, the Bank agreed to provide Debtors one additional time and a final opportunity to file a plan, which was filed on January 25, 2025.  ECF No. 128.

4.      As the sole secured creditor in Class 2 and Class 3, the Bank has voted against this Joint Plan as it would significantly impair its rights by forcing the Bank to take on the risk of 15-year, long-term financing of loans that have already matured, based on the purely speculative assumption that Debtors' business plan will magically succeed where it has already proven to be a failure.

5.      The Bank brings these objections to the Joint Plan because the plan was not made in good faith, the plan is not feasible, and Debtors cannot meet their burden to show the plan is fair and equitable. 11 U.S.C. §§ 1129(a)(3), (a)(11), (b).

2

6.      Every day that passes due the Debtors' stall tactics increases the already significant risk of diminution of the Bank's interest in the collateral securing its debts. Accordingly, the Bank requests the Court sustain its objections to Debtors' proposed plan of reorganization and convert these cases under Chapter 7 of the Bankruptcy Code or, in the alternative, dismiss them.

## II.      JURISDICTION & VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), 157(b)(2)(G), 157(b)(2)(M), and 157(b)(2)(O), and a contested matter under Bankruptcy Rule 9014. The Bank consents to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1408, 1409.

## III.      FACTUAL AND PROCEDURAL BACKGROUND

9.      On February 13, 2024 (the "Petition Date"), Debtors Chapman Motor and Premier each filed a voluntary petition under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division. Debtor Cavalier followed suit on February 14, 2024.

10.      The Debtors continue to operate their business and manage their affairs as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

11.      On March 1, 2024, the Court issued an Order Authorizing Joint Administration of the Chapter 11 cases of Kyle Chapman Motors Sales, LP (24-10143), KCMS Premier Credit, Inc.

(24-10144), and Cavalier Lamar Holdings, LP (24-10146) ordering that they be jointly administered under the lead case of Kyle Chapman Motors Sales, LP (24-10143). ECF No. 34.[1]

12.     As set forth in its Proof of Claim (Claim No. 12 in Case No. 24-10143), the Bank asserts that, as of the Petition date, Debtors owed the Bank an aggregate amount of $17,012,624.23, in addition to other fees, costs, charges, and expenses incurred with respect to the Loan Documents, including, but not limited to, the Bank's attorneys' fees and costs in an as yet to be determined amount, interest, and any and all other amounts to the extent permitted by the Bankruptcy Code and applicable law, less all applicable credits (the "Pre-Petition Indebtedness"). *See Loan Documents*, ECF Nos. 103-1 to 103-45.[2] Additionally, the Bank's attorneys' fees and costs, in an amount to be determined, as well as any and all related fees, costs, obligations, and liabilities associated with the Loan Documents, continue to accrue, and are in addition to the Pre-Petition Indebtedness.

13.     The Bank's indebtedness is secured by, among other things, the Debtors' real and personal property, including but not limited to accounts, inventory, chattel paper, equipment, fixtures, instruments, investment property, and documents (collectively, "Collateral"), and cash collateral, as such term is defined in Section 363 of the Bankruptcy Code ("Cash Collateral").

14.     On or about February 25, 2024, Debtors filed their *Joint Motion for Interim and Final Authority for the Debtors to Use Cash Collateral and Granting Related Relief*. ECF No. 22. On March 8, 2024, the Court issued the *First Interim Agreed Order Authorizing Use of Cash*

---

[1]     References to ECF Nos. shall be to the ECF filings in the lead case of *In re: Kyle Chapman Motors Sales, LP*, Cause No. 24-10143, unless otherwise stated.

[2]     Because the Loan Documents are voluminous and already docketed as exhibits to the Bank's Motion for Relief from the Automatic Stay, and in the Alternative, to Convert Cases (ECF Nos. 103-1 to 103-45, 103-56 to 103-57), the Bank incorporates them by reference here. To the extent any other references to exhibits filed with ECF No. 103 are made herein, those are also incorporated by reference. The Bank will include the Loan Documents and any other exhibits referenced herein in the Exhibit List it submits for the confirmation hearing and will provide copies to counsel and the Court in accordance with the Court's rules.

*Collateral and Providing Adequate Protection*.  ECF No. 42.  Then, on April 3, 2024, the Bankruptcy Court issued the *Final Agreed Order Authorizing Use of Cash Collateral and Providing Adequate Protection* (the "Final Cash Collateral Order"), authorizing Debtors to use the Bank's Cash Collateral in accordance with the terms of the order and to protect the Bank with adequate protection payments of $100,000 per week.  ECF No. 53.

15.     The Final Cash Collateral Order and Debtors' right to use the Bank's Pre-Petition Collateral or Post-Petition Collateral terminated on the date of expiration of the Debtors' exclusivity period to file a plan of reorganization under 11 U.S.C. §1121(c)(2), which was extended to September 10, 2024. ECF No. 85. After the expiration of the exclusivity period, the parties continued operating under the terms of the Final Cash Collateral Order by consent.

16.     On December 13, 2024, Debtors failed to comply with the terms and conditions of the Final Cash Collateral Order by failing to pay the Bank the adequate protection payment due on December 13, 2024 in the amount of $100,000, and informed the Bank via e-mail correspondence on December 13, 2024 that they were no longer able to make the ongoing $100,000 per week payments as previously agreed to. *See* ECF No. 103-46.

17.     On December 16, 2024, in accordance with the Final Cash Collateral Order, the Bank sent Debtors and the U.S. Trustee a letter notifying them that the Bank was objecting to further use of the Bank's Cash Collateral and intent to seek appropriate relief from this Court. *See* ECF No. 103-47.

18.     Thereafter, Debtors filed an Emergency Motion to Use Cash Collateral. ECF No. 100. The Bank filed a Motion for Relief from the Automatic Stay and, in the alternative, to Convert Cases. ECF No. 103. The Court held an expedited hearing on the parties' competing motions and, on January 9, 2025, the Court entered an agreed order directing Debtors to make adequate

protection payments of $50,000 on January 11, 2025, and $60,000 per week on or before January 17, 24, 31 and February 7, 2025, authorizing Debtors to use cash collateral to acquire inventory and directing Debtors to file their reorganization plan by January 25, 2025. ECF No. 123. The parties had until February 7, 2025 to try to negotiate a further cash collateral budget and, if they were unable to reach an agreement, re-file their motions as necessary. *Id*.

19.  On January 25, 2025, Debtors filed their Joint Plan of Reorganization (ECF No. 128) which the Bank will not vote for or consent to. The parties agreed to extend the agreed order on the use of cash collateral until May 31, 2025, in light of the Court's setting the confirmation hearing on the Joint Plan for May 16, 2025.

20.  The Bank now brings these objections to the Joint Plan, re-urges its Motion to Convert this case under Chapter 7, and alternatively, moves the Court to dismiss the cases.

## IV.  OBJECTIONS

21.  For the reasons discussed herein, the Bank objects to the Joint Plan. The Court should sustain the Bank's objections because the Joint Plan is speculative and fails to meet one or more of the technical and substantive requirements of § 1129(a) and (b), including, without limitation, feasibility and good faith. Further, the Joint Plan is not fair and equitable to the Bank. As Debtors admit, the Bank "has a security interest in substantially all of the Property of the Estates of the Debtors" and is the only secured creditor in this case. *See Joint Plan*, ECF No. 128 at 9. Yet, the Joint Plan cannot be confirmed under § 1129(a) and should not be confirmed under § 1129(b) because it fails to provide the Bank the indubitable equivalent of its secured claim. Specifically, the Bank objects to the Joint Plan because:

    i.  The Joint Plan significantly impairs the Bank's rights by forcing the Bank to take on the risk of a 15-year, long-term financing on loans that matured prior to the

Debtors' bankruptcy filings. *Compare Joint Plan*, ECF No. 128 at 13-14, *with First Amended Forbearance Agreement*, ECF No. 103-57 at 9 (after multiple prior extensions, final maturity date of January 31, 2024).

ii. The Bank has no obligation to extend or renew the loans and/or to continue financing the operations of the Debtors for 15 years (or any other period of time) based on the purely speculative assumption that Debtors' business plan will succeed where it has already proven to be a failure.

iii. Debtors offer no reason why the Bank should accept a plan in which Debtors would pay $115,000 per month when the original agreement on the use of cash collateral required payments of $100,000 per week—by court order. *Compare Joint Plan*, ECF No. 128 at 13, *with Final Cash Collateral Order*, ECF No. 53.

iv. The Joint Plan impedes the Bank's rights by relieving Debtors of their liability for attorneys' fees. *See Joint Plan*, ECF No. 128 at 14-15. The Loan Documents, however, allow for the Bank to recover attorneys' fees and the Joint Plan should not abridge the Bank's rights as provided under the Loan Documents. *See e.g. Loan Agreement*, ECF No. 103-1 at 31; *Note*, ECF No. 103-7 at 3; *Deed of Trust*, ECF No. 103-13 at 9; *Guaranty*, ECF No. 103-29 at 10.

v. The Joint Plan improperly allows Debtors to choose whether to make additional payments to the Bank out of cash flow, when all available cash constitutes the Bank's collateral and should be paid to the Bank under the terms of the Loan Documents. *Compare Joint Plan*, ECF No. 128 at 14 (indicating debtors "may, in their discretion, make additional payments from available cash flow from time to time…"); *with Security Agreement*, ECF No. 103-16 at 12 (providing that, [a]ll

amounts and proceeds…received by Grantor in respect of such accounts and general intangibles shall be received in trust for the benefit of Secured Party… [and] delivered to Secured Party…and applied to the Indebtedness"), and ECF No. 103-16 at 15 ("In any Event of Default… apply or use any cash held by Secured Party as Collateral"), and *First Amended Forbearance Agreement*, ECF No. 103-57 at 9 (Debtors agreed funds received by any of them are collateral and held in trust for the benefit of the Bank).

vi.   Debtors should not be allowed to give only a portion of the proceeds of liquidated assets which are the Bank's collateral to the Bank. *See Joint Plan*, ECF No. 128 at 14 (allowing Debtors to pay the Bank "up to 75%" of proceeds from the sale or liquidation of the Finance Receivables). This would impair the Bank's rights as the Bank has a lien on all of the collateral, including the finance receivables and the real estate, and such collateral secures the indebtedness on both loans. *See e.g. First Amended Forbearance Agreement*, ECF No. 130-57 at 8 ("all Collateral pledged by any Obligor shall and does constitute the collateral for any and all indebtedness now existing or hereafter executed by any Obligor to Frost").

vii.  The Joint Plain impairs the Bank's rights by designating only 50 percent of proceeds from the sale of real property to go towards payment of the loans. *Compare Joint Plan*, ECF No. 128 at 15 (allowing Debtors to only pay to the Bank "50%" of excess proceeds from the sale real estate towards the Credit Loan), *with First Amended Forbearance Agreement*, ECF No. 130-57 at 8 ("all Collateral pledged by any Obligor shall and does constitute the collateral for any and all indebtedness now existing or hereafter executed by any Obligor to Frost"). Debtors offer no reason

why the Bank should modify its loan terms to be more lenient than the terms the Bank was originally unwilling to accept when it first made the loans.

viii.  The Joint Plan would result in a windfall to insiders, i.e. the family members associated with the Debtors, by providing for $396,000 in annual salaries for Chapman family members, while forcing the Bank to continue financing operations for 15 years. *See Disclosure Statement*, ECF No. 127 (providing salaries for Kyle, Brian, Brad, and Brett Chapman totaling $396,000 per year).

ix.  The Joint Plan is not feasible because its only secured creditor—the Bank—would be assuming all the risk for a purely speculative long-term plan.

x.  The Joint Plan provides inappropriate opportunities for the Debtors to cure future payment defaults considering the Debtors are already in default. *Compare Joint Plan*, ECF No. 128 at 21 (providing thirty-day notice and cure period for any default), *with First Amended Forbearance Agreement*, ECF No. 103-57 at 9 (entire outstanding balance due and payable on January 31, 2024)

xi.  The Joint Plan impairs the Bank's rights under the Loan Documents to enforce certain debt service coverage ratios and borrowing base covenants and does not address such existing covenant defaults and how these defaults exist and would continue to exist through the proposed Joint Plan.  *Compare Joint Plan*, ECF No. 128 at 13 (providing that "[a]ll defaults and events of default existing as of the Petition Date and as of the Effective Date shall be deemed cured and waived"), *with First Amended Forbearance Agreement*, ECF No. 103-57 at 10 (Debtors acknowledged and agreed they are in default of the Free Cash Flow Covenant), and

*Loan Agreement*, ECF No. 103-1 at 20 (requiring borrowing base certificates using value of 70% of Eligible Accounts).

xii.     The Joint Plan improperly seeks to restrain the Bank's rights to enforce the Guaranty signed by non-debtor, Kyle Chapman. *Compare Joint Plan*, ECF No. 128 at 14-15, *with Guaranty Agreements*, ECF Nos. 103-29 and 103-30.

xiii.    The Bank is opposed to Debtors' request for the Court to enjoin the Bank from pursuing its state law claims against Kyle Chapman under the Guaranty executed by Kyle Chapman in favor of the Bank. *Compare Joint Plan*, ECF No. 128 at 14-15, *with Guaranty Agreements*, ECF Nos. 103-29 and 103-30. Further, the Bank already filed a lawsuit in state court against Kyle Chapman on February 10, 2025 based on his obligations as a guarantor and this case remains pending.  Kyle Chapman has personal assets and properties to satisfy his obligations under the guaranty and there is no evidence that the guarantor suit would have an adverse impact on the Debtors' ability to accomplish reorganization.

22.     For these reasons, and based on the caselaw cited below, Frost Bank objects to the Joint Plan because it is unconfirmable.

## V.    ARGUMENT AND AUTHORITIES AS TO OBJECTIONS

### A.   *Debtor's Plan is Not Made in Good Faith*

23.     Section 1129(a) lists several requirements which must be met for a plan to be confirmed. *See generally* 11 U.S.C. 1129(a). Included in those requirements is that it be proposed in good faith. *See* 11 U.S.C. § 1129(a)(3). Where, as here, the Bank has objected to a plan on the basis of good faith, the Debtors bear the burden of showing, by a preponderance of the evidence,

that the plan was proposed in good faith and not by any means forbidden by law. *In re Pearl Res. LLC*, 622 B.R. 236, 260 (Bankr. S.D. Tex. 2020).

24.     The term "good faith" is not defined in the Bankruptcy Code. *Pearl Resources*, 622 B.R. at 260. The Fifth Circuit has stated, "[w]here the plan is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of success, the good faith requirement of § 1129(a)(3) is satisfied." *In re Sun Country Dev., Inc.*, 764 F.2d 406, 408 (5th Cir. 1985).

25.     Courts consider the following factors in determining whether a plan evinces good faith: (1) whether the proposed plan promotes a result consistent with the Bankruptcy Code's objectives; (2) whether the proposed plan has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and (3) whether the debtor exhibited fundamental fairness in dealing with its creditors. *In re Trinity Family Practice & Urgent Care PLLC*, 661 B.R. 793, 813 (Bankr. W.D. Tex. 2024). Good faith is to be judged in light of the "totality of the circumstances." *Id*.

26.     In this case, Debtors' Joint Plan bears numerous badges of bad faith. Debtors entered into Bankruptcy proceedings in an effort to evade their only secured creditor, the Bank, and then delayed creating a plan for reorganization for almost a year until forced to do so by the Bank and the Court. Now they offer a Joint Plan that significantly impairs the Bank's rights, while creating a windfall for Debtors and their family—with hefty annual salaries for four Chapman family members.

27.     Moreover, the Joint Plan would allow Debtors to pay $115,000 per month when the agreement on the use of cash collateral required payments of $100,000 per week—by court order (which was modified to $60,000 per week by agreement for a temporary period first to allow the Debtors a last opportunity to file a plan and thereafter to get the parties through the confirmation

hearing). The plan further affords rights to the Debtors that they do not have under the Loan Documents by relieving them of liability for attorneys' fees, affording improper opportunities to cure future defaults, granting them control over cash flow they do not currently enjoy, allowing them to liquidate assets and sell real property without repaying the Bank in full, allowing them to remain in default on borrowing base covenants, and allowing non-debtor guarantors to escape their personal liability for the payment of the loans. At the same time, the Joint Plan allows Debtors to pay their family members approximately $396,000 in salaries.

28.     Because Debtors have not proposed their Joint Plan in good faith, Debtor cannot meet the good faith requirement of § 1129 and the Bank's objections to the Joint Plan should be sustained.

### B. Debtors' Plan Fails to Comply with § 1129(a)(8)

29.     Debtors do not comply with § 1129(a)(8) because the Bank is the only secured creditor in Class 2 and Class 3, both of which are impaired classes, and the Bank has not accepted the Joint Plan.

### C. Debtors' Plan is Not Feasible

30.     Additionally, the Joint Plan fails under § 1129(a)(11). The court has an independent and affirmative obligation, under § 1129(a)(11), to scrutinize a plan to determine whether it is feasible. *In re Lakeside Global Village II, Ltd.*, 116 B.R. 499, 506 (Bankr. S.D. Tex. 1989). The word "feasible" is applied in its ordinary meaning—that something is capable of being done or carried out—it does not connote absolute assurance of success but does require a reasonable assurance of success. *See Beal Bank, S.S.B. v. Way Apts., D.T.* (*In re Way Apts., D.T.*), 201 B.R. 444, 453 (N.D. Tex. 1996); *In re M & S Assocs., Ltd.*, 138 B.R. 845, 851 (Bankr. W.D. Tex. 1992). To demonstrate feasibility, the plan proponent must establish that there will be sufficient cash flow

to fund the plan and maintain operations according to the plan. *See Canal Place Ltd. Partnership v. Aetna Life Ins. Co.* (*In re Canal Place Ltd. Partnership*), 921 F.2d 569, 579 (5th Cir. 1991). Bankruptcy courts are skeptical of plans that allow debtors "to postpone the inevitable, and to gamble with [creditors'] money on a long-shot possibility of drastic improvement in the [Debtor's businesses]." *See, e.g., In re M & S Assocs, Ltd.*, 138 B.R. at 852.

31.　　In this case, the proposed Joint Plan is not feasible because its only secured creditor—the Bank—would be assuming all the risk for a purely speculative long-term plan. The Joint Plan significantly impairs the Bank's rights by forcing the Bank to take on the risk of 15-year, long-term financing on loans that have already matured and that it never agreed to and would never had agreed to when it made the loans. The Bank has no obligation to extend or renew the loans based on the purely speculative assumption that Debtors' business plan will succeed especially where it has already proven to be a failure. The Court should, therefore, find the Joint Plan fails to pass the feasibility test under section 1129(a)(11).

### D.　*Debtor's Plan Should Not be "Crammed Down" because it is not Fair and Equitable*

32.　　Section 1129(b) requires that for a Plan to be confirmed over the objection of an impaired class, the Plan must not discriminate unfairly and must be fair and equitable to the classes which the Debtor proposes to cram down. *In re Elm Creek Joint Venture*, 93 B.R. 105, 110–11 (Bankr. W.D. Tex. 1988). For the purposes of determining whether or not the Plan discriminates unfairly, and is fair and equitable with respect to the class of claims that is impaired under and has not accepted the Plan, the Code provides that the condition that the Plan be fair and equitable includes, with respect to a class of secured claims, that the Plan provide for the realization by such holders of the indubitable equivalent of such claims. *Id*.

33.     Here, the Joint Plan is not fair and equitable because it does not provide for the Bank to receive the indubitable equivalent of its claims. On the contrary, as expressly described in each of the Objections stated above, the Joint Plan would force the Bank to continue financing Debtors' operations, while bearing all the risk for a long-term plan based on pure speculation, and relinquishing many of its rights under the parties' prior agreements. For each and all of the reasons raised in the Bank's Objections, Debtors cannot show the plan is fair and equitable.

## VI.     MOTION TO CONVERT

34.     In light of the foregoing, and in accordance with its reservation of rights stated in the Agreed Order (ECF No. 123), the Bank hereby renews its Motion to Covert filed on December 19, 2024 and re-urges the Court to convert the Debtors' bankruptcy cases to Chapter 7 for cause. *See* ECF No. 103.

35.     Section 1112(b) of the Bankruptcy Code provides that, on request of a party in interest, and after notice of a hearing, a Bankruptcy Court may convert a Chapter 11 case to a Chapter 7 case "for cause." 11 U.S.C. § 1112(b).

36.     Although the Bankruptcy Code does not define "for cause," it does provide a non-exhaustive list of examples of cause to assist the bankruptcy court in determining whether cause has been shown. *Id.* § 1112(b)(4). Relevant here, those examples include:

> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
>
> (C) unauthorized use of cash collateral substantially harmful to 1 or more creditors;
>
> (E) failure to comply with an order of the court;
>
> (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

(J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; and

(M) inability to effectuate substantial consummation of a confirmed plan.

*Id.* § 1112(b)(4)(A), (C), (E), (F), (J), (M).

37.    When determining whether "cause" has been shown, the bankruptcy court must consider the totality of the circumstances. *In re Baribeau*, 603 B.R. 797, 802 (Bankr. W.D. Tex. 2019) (citing *Matter of T-H New Orleans, L.P.*, 116 F.3d 790, 802 (5th Cir. 1997)). Once the movant demonstrates cause for conversion or dismissal, the bankruptcy court must convert or dismiss the case unless the debtor meets its burden to establish both prongs of the exception set forth in § 1112(b)(2). 11 U.S.C. § 1112(b)(2).

38.    First, the debtor must "specifically identify unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate." *Id.* Second, the debtor must prove all the following: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate under § 1112(b)(4)(A); (3) there is reasonable justification or excuse for a debtor's act or omission; and (4) the act or omission will be cured within a reasonable time." *Baribeau*, 603 B.R. at 802 (quoting *In re Delta AG Grp., LLC*, 596 B.R. 186, 196 (Bankr. W.D. La. 2019) (in turn, citing 11 U.S.C. § 1112(b)(2)(A)–(B))).

39.    Here, cause supports converting this case to a Chapter 7 case because Debtors (i) failed to comply with the Final Cash Collateral Order (ECF No. 85), as described above, by failing to make the originally agreed upon adequate protection payments to the Bank; (ii) using cash collateral in an unauthorized manner given their failure to make the originally agreed upon adequate protection payments to the Bank (until the temporary agreed orders were entered); (iii) failing to file a timely and confirmable proposed plan of reorganization and (iv) failing to timely

15

file monthly operating reports. Each of these failures demonstrate cause supporting conversion of this case to a Chapter 7 case.[3] *See* 11 U.S.C. § 1112(b)(4) (D), (E), (F), (J).

40.     Critically, in addition to the above, based on reports provided by Debtors to the Bank, it is evident that there is a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. *See* 11 U.S.C. § 1112(b)(4)(A).

41.     When examining a motion under § 1112(b)(4)(A), courts "must look beyond a debtor's financial statements and make a full evaluation of the present condition of the estate." *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. 843, 856 (Bankr. S.D. Tex. 2023). Whether or not the situation is "tolerable under the circumstances," "the loss or diminution should not continue ... beyond the point at which reorganization no longer remains realistic." *Id.* (internal quotations omitted). "The alleged loss can either be sufficiently large given the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of the creditors or can be an ongoing issue, such as negative cash flow." *Id.* (internal citations omitted). "Cause" can be premised on either a substantial or continuing loss, and either will support conversion. *In re TMT Procurement Corp.,* 534 B.R. 912, 920 (Bankr. S.D. Tex. 2015).

42.     To establish cause under § 1112(b)(4)(A), the moving party must show that there is both (i) a substantial or continuing loss to or diminution of the estate and (ii) the absence of a reasonable likelihood of rehabilitation. *In re M.A.R. Designs & Constr., Inc.*, 653 B.R. at 855.

43.     Here, both elements are met. When the Bank first filed its Motion to Convert on December 19, 2024, Debtors were suffering a negative cash flow and substantial declining assets values. From the Petition Date through December 2024, Debtors' cash balance continuously

---

[3]     Each of the agreed orders and extensions thereto following Debtors' default under the Final Cash Collateral Order (ECF No. 85) were interim orders and/or made without prejudice to the Bank re-filing its Motion to Convert. *See* ECF 113 at 2, ECF No. 123 at 5, and ECF No. 147 at 3.

declined, ranging from negative ($188,250) in mid-September to negative ($731,338) on December 7, 2024.

44.     While the cash balance has since seemingly improved on paper, it appears that change is explained entirely by Debtors' reduced payments to the Bank.  From January 2025 through April 12, 2025 (the date of the last report provided by Debtors to the Bank), the closing cash balance has ranged from approximately $213,000 on the low end to a closing cash balance of $434,214 on April 12, 2025.  This development, however, is unlikely to be the result of any success attributable to the Debtors' business, but rather Debtors' reduction in weekly payments to the Bank, which began in January 2025.  Specifically, Debtors have reduced their payments to the Bank from $100,000 per week to $60,000 per week.  If Debtors' payments to the Bank had remained the same as originally agreed and ordered by this Court, cash flow would remain a significant concern.

45.     This reality is reflected in Debtors' actual income received, which continues dropping.  As the Bank reported in December 2024, from the period of October 6, 2024 to the present, Debtors income projections have been consistently and substantially inflated, and have resulted in variances that, with a few positive exceptions, have generally been negative and ranged between -2% and -29%.  On December 7, 2024, the variance between projected income and actual income was -15%.  As of April 12, 2025, the variance between projected income and actual income *remained* negative at -12%.

46.     The value of the Debtors' notes receivables, which are part of the Bank's Collateral, similarly continues declining.  As the Bank noted in December, on August 25, 2024, the value of the notes receivables, discounted conservatively by 15% for ineligible and uncollectible accounts, was approximately $12.56 million (and only $8.79 million when you apply the 70% borrowing base required by the Loan Agreement [ECF No. 103-1 at 20]).  Only four months later, on

December 7, 2024, the value of the notes receivables, again discounted conservatively by 15% for ineligible and uncollectible accounts, dropped to $11.07 million (and only $7.75 million when you apply the 70% borrowing base).  Now, as of April 12, 2025, the value of notes receivables, again discounted by 15%, dropped to $9.06 million (and only $6.34 million when you apply the 70% borrowing base).[4]

47.     The value of existing inventory also dropped significantly from approximately $847,205 in August 2024 to $591,028 on December 7, 2024.  While it has increased to $765,565 as of April 12, 2025, it appears the increase is attributable to the Bank's agreement to allow additional purchases of inventory with its cash collateral.  The overall value of the collateral, however, remains lower than one year ago and critically, the incremental increase in inventory from December to the present (in the amount of $174,537), does not justify the $40,000 spent each week on inventory, for the 16 weeks from January 12, 2025 through April 28, 2025, which equals $640,000. While the Debtors' use of additional amounts of the Bank's cash collateral is delaying the ship from sinking, it is not sustainable nor equitable to the Bank (who could have received $640,000 of cash and instead only received an incremental increase to its collateral).

48.     With the outstanding balance on the debt at approximately $12.69 million as of May 9, 2025, it is clear that the Bank's position (which under the Loan Documents required a borrowing base of 70% for notes receivables and 50% for inventory) continues deteriorating, with a trend of continuing decline.  In sum, these losses and substantial diminution in value make it clear that a reorganization is not realistic or feasible.

49.     Indeed, the financial reports week after week show there is no reasonable likelihood

---

[4] Debtors started including in their compliance reports columns for monthly, semi-monthly, and bi-weekly "ineligible" receivables to capture accounts for which they are unlikely to collect.  The Bank believes these columns do not capture the full scope of **ineligible and uncollectable** accounts.

of rehabilitation in this case as the only recent improvement to Debtors' overall financial outlook (which may be more accurately described as an artificially delayed decline) appears to be attributable to the reallocation of the Bank's cash collateral, with the diminished payments to the Bank. The Bank's loans matured in January 2024, and the Bank has no obligation to continue financing Debtors' operations until they fully fail.

50.     For the reasons stated above, the Bank requests that the Court convert the Debtors' cases to Chapter 7 cases.

## VII.  <u>ALTERNATIVE MOTION TO DISMISS</u>

60.     In addition, and in the alternative, the Court should dismiss these cases in their entirety because this is essentially a two-party dispute which has no business in bankruptcy court.

61.     Bankruptcy courts consider the totality of the circumstances in determining whether there is cause for dismissal. *In re Kickapoo Kennels, LLC*, Case No. 12–39321–H3–11, 2013 WL 3148656 at *1 (S.D. Tex. June 19, 2013) (citing *Matter of Atlas Supply Corp.*, 857 F.2d 1061 (5th Cir. 1988)). Courts generally dismiss cases where it appears the debtor was attempting to use the provisions of the Bankruptcy Code to gain an unfair advantage in a two-party dispute. *Id.* (collecting cases); *see also In re Starmark Clinics, LP*, 388 B.R. 729 (Bankr. S.D. Tex. 2008). This is because "[a]llowing the dispute to be resolved in bankruptcy confers unwarranted leverage in favor of the Debtors, without the attendant equities that normally justify that leverage." *In re Anderson Oaks (Phase I), LP*, 77 B.R. 108, 112 (Bankr. W.D. Tex. 1987). Courts will find such two-party disputes "violate the 'good faith' prerequisite to invoking the bankruptcy court's equitable jurisdiction." *Id.* (citing *In re Landmark Capital Company,* 27 B.R. 273, 281 (Bankr. D.Ariz. 1983); *Matter of Volpe,* 53 B.R. 46, 48 (Bankr. M.D. Fla. 1985); *Matter of Roy Dawson Radio Corp., Inc.,* 70 B.R. 588, 591 (Bankr. M.D. Fla. 1987).

62.     The instant case has all the hallmarks of a two-party dispute.  Debtors filed for bankruptcy in an attempt to circumvent their obligations to their sole secured creditor—and largest creditor by far—the Bank.  As of May 9, 2025, Debtors owe a total of $12,690,049.08.  The amount Debtors owe to ***all other creditors combined*** is approximately 2% of what they owe the Bank. Specifically, they owe $108,795.68 in ad valorem taxes and $157,488.03 in unsecured claims (1.2% if you only consider the unsecured claims). *See Joint Plan*, ECF No. 128 at 11.

63.     Courts have found similar factual scenarios to constitute a two-party dispute masquerading as a bankruptcy dispute.  In *Ramji*, for example, the court found "[t]he size of [creditor's] claim in relation to the other claims in this case and the relative lack of other claims suggests the case involves primarily a two-party dispute between the Debtor and [creditor]."  *In re Ramji,* 166 B.R. 228, 290 (Bankr. S.D Tex. 1993).  In *Anderson*, the court found debtors cannot "use the Bankruptcy Code as a device with which to force [their] lender into renegotiating their loan." *In re Anderson Oaks*, 77 B.R. at 112.  It went on to note, where "cramdown is not available, it is pointless to further consider a plan which requires cramdown for its success." *Id*. at 113.

64.     For these reasons, the Court should prevent Debtors from abusing the Bankruptcy Code to gain advantage in this two-party dispute and dismiss Debtors' bankruptcy cases in their entirety.

## VIII.    RESERVATION OF RIGHT TO SUPPLEMENT AND AMEND

65.     Frost Bank reserves and retains the right to supplement and amend its objections to the Debtors' Joint Plan when, as, and if additional information becomes available.

## IX.    PRAYER FOR RELIEF

66.     For the reasons described herein, Frost Bank requests the Court enter an order (i) sustaining the Bank's Objections to the Joint Plan and denying approval of the Plan, (ii) converting

the Debtors' bankruptcy cases to Chapter 7 for cause or, in the alternative, dismissing the cases,

and (ii) granting such other and further relief that this Court deems proper both at law and in equity.

Dated: May 9, 2025

Respectfully Submitted,

**DAVIS & SANTOS, PLLC**

By:     /s/ Sarah Santos
        Sarah Santos
        State Bar No. 24040955
        E-mail: ssantos@dslapw.com
        Landon M. Hankins
        State Bar No. 24100924
        E-mail: lhankins@dslawpc.com
        719 S. Flores Street
        San Antonio, Texas 78204
        Telephone: (210) 853-5882
        Facsimile: (210) 200-8395
        ***Attorneys for Frost Bank***

## CERTIFICATE OF SERVICE

I hereby certified that on May 9, 2025, a true and correct copy of the foregoing document was served on counsel of record and the parties below as follows:

**Served via electronic filing:**

Todd Brice Headden
HAYWARD PLLC
7600 Burnet Road, Suite 530
Austin, TX 78757
Telephone: (737) 881-7104
E-mail: *theadden@haywardfirm.com*
***Attorney for Debtor***

Jason A. Starks
ASSISTANT COUNTY ATTORNEY
P.O. Box 1748
Austin, TX 78767
Telephone: (512) 854-9092
Email: *jason.starks@traviscountytx.gov*
***Attorney for Travis County***

Gary Wright
ASSISTANT U.S. TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, TX 78701
Telephone: (512) 916-5329
E-mail: *gary.wright3@usdoj.gov*
***U.S. Trustee***

H. Spence Morano
LEAK, DOUGLAS & MORANO, PC
17 20th Street North, Suite 200
Birmingham, AL 35203
Telephone: (205) 977-7099
Email: *smorano@leakdouglas.com*
***Attorney for Snyder's Salvage***

Julie Anne Parsons
MCCREARY, VESELKA, BRAGG & ALLEN, P.C.
P.O. Box 1269
Round Rock, TX 78680
Telephone: (512) 323-3200
E-mail: *jparsons@mvbalaw.com*
***Attorney for The County of Hays, Texas***

Christopher V. Arisco
PADFIELD & STOUT, L.L.P.
100 Throckmorton St, Suite 700
Fort Worth, TX 76102
Telephone: (817) 338-1616
Email: *carisco@padfieldstout.com*
***Attorney for LEAF Capital Funding, LLC***

Daine W. Sanders
LINEBARGER GOGGAN BLAIR & SAMPSON, LLP
P.O. Box 17428
Austin, TX 78760
Telephone: (512) 447-6675
Email: *austin.bankruptcy@lgbs.com*
***Attorney for Hays CISD and San Marcos CISD***

**Served via Regular Mail:**

| | | |
|---|---|---|
| Kyle Chapman Motor Sales, L.P.<br>18300 S. IH 35<br>Buda, TX 78610<br>***Debtor*** | TX Comptroller<br>Revenue Accounting Division<br>P.O. Box 13528<br>Austin, TX 78711<br>***Unsecured creditor*** | Henderson, Hutcherson &<br>McCollough, PLLC<br>1200 Market Street<br>Chattanooga, TN 37402<br>***Unsecured creditor*** |
| KCMS Premier Credit, Inc<br>18300 S. IH 35 Box 594<br>Buda, TX 78610<br>***Debtor*** | Cavalier Lamar Holdings, L.P.<br>18300 S. IH 35<br>Buda, TX 78610-5735<br>***Debtor*** | Kia of South Austin<br>6161 Rothway Street<br>Houston, TX 77040<br>***Unsecured creditor*** |
| PayChex<br>911 Panorama Trail South<br>Rochester, NY 14625<br>***Unsecured creditor*** | JM Auto Sales<br>11088 County Road 272<br>Bertram, TX 78605<br>***Unsecured creditor*** | A&R Auto Center, LLC<br>P.O. Box 2168<br>Kyle, TX 78640<br>***Unsecured creditor*** |
| Capital One<br>P.O. Box 65019<br>City of Industry, CA 91716<br>***Unsecured creditor*** | South Texas Auto Exchange<br>1346 Parkridge Drive<br>San Antonio, TX 78216<br>***Unsecured creditor*** | World Pac<br>P.O. Box 674687<br>Dallas, TX 75267<br>***Unsecured creditor*** |
| Austin Nas Auto, LLC<br>10836 N. Lamar Blvd<br>Austin, TX 78753<br>***Unsecured creditor*** | Arnold Oil Company<br>P.O. Box 18089<br>Austin, TX 78760<br>***Unsecured creditor*** | Drive Wholesale, LLC<br>22583 Highway 59 N<br>Robertsdale, AL 36576<br>***Unsecured creditor*** |
| Jerry Williams Motors<br>12018 Hwy 290 W<br>Austin, TX 78737<br>***Unsecured creditor*** | Elio's Auto Repair<br>4709 Preakness Street<br>Del Valle, TX 78617<br>***Unsecured creditor*** | JB's Collision Center<br>104 Texas Avenue<br>San Marcos, TX 78666<br>***Unsecured creditor*** |
| Peak BHPH Performance<br>10228 E. Northwest Hwy, #1074<br>Dallas, TX 75238<br>***Unsecured creditor*** | Boost Foundry, LLC dba<br>Magiloop<br>237 S. Terrace<br>Wichita, KS 67218<br>***Unsecured creditor*** | RME Recovery<br>15505 N. Interstate 35, Ste B<br>Pflugerville, TX 78660<br>***Unsecured creditor*** |
| Henna Chevrolet<br>P.O. Box 15347<br>Austin, TX 78761<br>***Unsecured creditor*** | South Point Hyundai<br>4610 S. Interstate 35<br>Austin, TX 78745<br>***Unsecured creditor*** | |

*/s/ Sarah Santos*
Sarah Santos